**ILLINOIS CENTRAL RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, an unincorporated association et al., Defendants.**

**No. 68 C 1382.**

United States District Court
N. D. Illinois, E. D.
April 24, 1969.

Robert Mitten, John W. Foster and Lawrence Lawless, Chicago, Ill., Francis M. Shea and Ralph J. Moore, Jr., Shea & Gardner, Washington, D. C., for plaintiff.

Burke Williamson, Adams, Williamson & Turney, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PERRY, District Judge.

This cause comes on to be heard upon complaint and answer and after a petition for a preliminary injunction was denied to the plaintiff. The Court took testimony both before the denial of a preliminary injunction and afterward and has now considered all of the evidence presented, the pleadings, briefs and arguments of counsel. The Court hereinafter sets forth its opinion concerning the interpretation of the status quo provisions of the Railway Labor Act (45 USC § 151 and following) as applicable to the facts in this cause.

Immediately after filing its complaint for injunction on July 24, 1968, the plaintiff, Illinois Central Railroad Company, sought an order to prevent a strike scheduled by the defendant Brotherhood of Locomotive Engineers as the collec-

tive bargaining representative under the Railway Labor Act of the craft or class of locomotive engineers in the employ of the Illinois Central.

It appeared that in April, 1968, the Illinois Central stated to the Brotherhood that it was considering inauguration of a so-called Strike Program intended to train its administrative or supervisory personnel as locomotive engineers so as to be able to maintain partial operation of the railroad in the event of a strike by its trainmen employees represented by the Brotherhood of Railroad Trainmen. The Brotherhood replied that if the contemplated Strike Program affected the duties and responsibilities of locomotive engineers in the operation of locomotives in their charge the Brotherhood would object and would take such action as it deemed appropriate.

In late April or early May, 1968, the Brotherhood learned that the Illinois Central had inaugurated its Strike Program. As part of this plan the Illinois Central's Traveling Engineers or other management personnel would state to the locomotive engineer in charge of a locomotive that he should turn over the throttle of the locomotive to such management personnel, that the locomotive engineer was relieved from responsibility for the locomotive, that the locomotive engineer should place himself elsewhere in the locomotive or, in some instances, in a following diesel locomotive unit, but that if the locomotive engineer left the engine and returned to his home he would be discharged. Locomotive engineers who were thus requested or required to relinquish the controls of their locomotives were paid as though they had performed their duties and responsibilities as locomotive engineers. Prior to this time the Illinois Central did not request or require its locomotive engineers to relinquish the controls of the locomotive in their charge to the Traveling Engineer or other management personnel for the purpose of such training.

The Brotherhood protested against this action of the Illinois Central, but the Illinois Central continued the Strike Program. On June 3, 1968, the Brotherhood served on the Illinois Central a notice under Section 6 of the Railway Labor Act (45 U.S.C. § 156) stating the wish of the engineers "to revise and supplement existing agreements in accordance with proposal attached hereto." The attached proposal was intended to put an end to the engineers' required or requested participation in the Strike Program.

Conferences were held on June 28, 1968, between the Illinois Central and the Brotherhood on the Section 6 notice, as required by the Railway Labor Act. No agreement was reached and negotiations were terminated, not later than July 5, 1968. Neither the Illinois Central nor the Brotherhood requested the assistance of the National Mediation Board.

The Brotherhood scheduled a strike for July 23, 1968, on account of the dispute arising from the Section 6 notice of June 3, 1968. The National Mediation Board at once found that a labor emergency existed, proffered its services pursuant to Section 5 of the Railway Labor Act, requested the parties to maintain the status quo while the dispute was investigated, docketed the case as NMB Case E–342, and requested the Brotherhood to defer strike action pending the Board's efforts to resolve the dispute. A mediator, who was already on the property, was assigned by the Board to handle the case. The parties accepted without condition the offer of mediation. No settlement has been effected, but the Mediation Board has not notified the parties that its efforts have failed.

The Illinois Central and the Brotherhood agreed that for two days, July 23, and July 24, 1968, the Illinois Central would suspend the training of personnel under the Strike Program and the Brotherhood would postpone the strike. Further the parties stated to the Court that during the period of the hearings the training under the Strike Program would be suspended and the strike would be postponed.

The Court conducted hearings on the Illinois Central's motion for a temporary restraining order and preliminary injunction over a period of several days. On August 2, 1968, the Court entered its Findings of Fact, Conclusions of Law, and Order disposing of motion for preliminary injunction (See 288 F.Supp. 504). The Court concluded that the Illinois Central and the Brotherhood are both bound by the status quo provisions of Section 5 of the Railway Labor Act; that until such time as the National Mediation Board has notified both parties in writing that its mediatory efforts have failed and until the other and further applicable periods of time provided in the Railway Labor Act have expired, no change may be made by either party in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose; that, as applicable to the Illinois Central, it was not permitted to request or require its locomotive engineers to relinquish the controls of the locomotives in their charge to the Traveling Engineers or other management personnel for the purpose of training administrative or supervisory personnel to operate the locomotives; and that, as applicable to the Brotherhood, the employees might not strike on account of the labor dispute arising from the Section 6 notice. The Illinois Central's motion for a preliminary injunction was denied, and the Court noted that it would enter further orders as appropriate.

In subsequent pleadings the Illinois Central urged that the Brotherhood's Section 6 notice of June 3, 1968, raised a jurisdiction or representation dispute involving the training of locomotive enginemen apprentices, as to which the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen were then contending (See Brotherhood of Locomotive Engineers v. National Mediation Board, 284 F.Supp. 344 (United States District Court, District of Columbia, April 26, 1966; reversed in Brotherhood of Locomotive Firemen and Enginemen v. National Mediation Board, and National Mediation Board v. Brotherhood of Locomotive Engineers, 410 F.2d 1025 (United States Court of Appeals for the District of Columbia, March 14, 1969). The Illinois Central suggested that the present case is one for the National Mediation Board.

Further, on December 10, 1968, the Illinois Central submitted ex parte to the National Railroad Adjustment Board, First Division, what it described as a dispute between the Illinois Central and the Brotherhood of the claim of the Illinois Central that it has the right to train its officers and employees in the operation of locomotives on locomotives manned by engineers, and that nothing in the rules established by the collective bargaining agreements restricts this right.

A trial on the merits was had on February 13, 1969. The parties stipulated that evidence theretofore received by the Court at the application for a preliminary injunction would become part of the record on the trial on the merits and need not be repeated. The Court heard additional testimony of witnesses and received additional written material. Further briefs and arguments have been considered by the Court.

The Court finds that the labor dispute out of which this litigation arose is stated in the Section 6 notice of June 3, 1968, and that there is no connection between that dispute and the controversy of the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen pertaining to the training of apprentice engineers.

Further, the Court finds that the claim stated by the Illinois Central in its subsequent submission to the National Railroad Adjustment Board, First Division, is not the dispute which resulted in the threatened strike and this litigation.

This leaves as the principal question to be determined the application of the

status quo provisions of the Railway Labor Act to the facts of this case.

Section 2 Seventh of the Railway Labor Act (45 U.S.C. § 152 Seventh), the Illinois Central declares, does not prevent the inauguration of its Strike Program because the collective bargaining agreement does not specifically prohibit such a Program. Only the National Railroad Adjustment Board can determine otherwise, the railroad alleges. The status quo provision of Section 5 First are not applicable, the Illinois Central contends, because the National Mediation Board has not notified the parties in writing that its mediatory efforts have failed. The Illinois Central maintains that Section 6 of the Act governs the carrier's obligation from the time a Section 6 notice is served until the controversy has been finally acted upon by the Mediation Board as required by Section 5 of the Act, that this time has not yet arrived, that the staus quo provisions of Section 6 require only that the carrier not alter "working conditions" as they were when the Section 6 notice was served, that the Strike Program was already being operated by the carrier when the Section 6 notice was served, and that no status quo provisions are now applicable to the carrier.

The Brotherhood, on the other hand, argues that when the National Mediation Board found that a labor emergency existed and proffered its services under Section 5 of the Act, which offer was accepted without condition by the parties, the legal effect is that the parties are again subject to the provisions of Section 6 of the Act, which, in turn, requires that the status quo be maintained until the Mediation Board has acted as required by Section 5 of the Act. The Brotherhood urges that the "working conditions" which the status quo provisions of Section 6 of the Act prohibit the carrier from altering encompass "established practices in effect prior to the time the dispute arose", as used in Section 5, and "conditions out of which the dispute arose", as used in Section 10 of the Act. Finally, the Brotherhood asserts that the Court, in passing on a request for an injunction against a strike, has jurisdiction to determine what were the working conditions, established practices in effect prior to the time the dispute arose, and conditions out of which the dispute arose.

There are four status quo provisions in the Railway Labor Act, portions of which are as follows (45 U.S.C. §§ 152 Seventh; 155 First; 156, 160):

Section 2 Seventh:

"No carrier * * * shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in Section 6 of the Act";

Section 5 First:

"The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time.

\* \* \* \* \* \*

" * * * the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, * * * no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose."

Section 6:

\* \* \* \* \* \*

"In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by Section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."; and

Section 10: (Emergency Board)

\* \* \* \* \* \*

"After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

In this litigation there was first a Section 6 notice dated June 3, 1968. While conferences about this notice were proceeding, the Illinois Central could not alter "working conditions" until the controversy had been finally acted upon by the Mediation Board as required by Section 5 of the Act * * * unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board." Conferences terminated not later than July 5, 1968, and more than ten days thereafter elapsed without a request for the Mediation Board or a proffer of its services. It is not necessary, because of subsequent occurrences, to decide whether after such ten days the carrier might have altered "working conditions" or the employees might have gone on strike.

After the strike was scheduled the Board of its own volition proffered its services under Section 5 of the Act. The parties accepted this proffer without condition. But the Board has not yet notified the parties in writing that its mediatory efforts have failed. The Illinois Central urges that, under these circumstances, no status quo provisions of Section 5 are applicable to prevent it from resuming its Strike Program.

■ The Court is of the opinion that, even though conferences between the parties terminated and more than ten days elapsed thereafter, the subsequent entry of the Mediation Board into the dispute, with the acquiescence of the parties, re-established the status quo requirements of Section 6 that "working conditions" not be altered by the carrier until the controversy had been finally acted upon under Section 5.

■ The Court has observed that in Section 2 Seventh the prohibition is against a change by the carrier of "working conditions * * * as embodied in agreements". The final determination of whether such a change has occurred is a question for the National Railroad Adjustment Board.

But once a Section 6 notice has been served the prohibition is against a change by the carrier of "working conditions" until the Mediation Board gives written notice of the failure of its efforts, and for thirty days thereafter (unless procedures of arbitration or of an emergency board are under way) " * * * no change shall be made in * * * working conditions or established practices in effect prior to the time the dispute arose."

■ The Court does not perceive any reason to make a distinction between the interpretation of "working conditions" while the Mediation Board is making mediatory efforts and "working conditions" for the thirty days after the mediatory efforts of the Board have failed. In the present litigation, for example, it would be illogical to hold that the Illinois Central's Strike Program could be continued while the Mediation Board was trying to effect a settlement of the Engineer's Section 6 notice, but that the Strike Program must be discontinued when the Mediation Board advised of its failure, and for thirty days thereafter, or that the Strike Program must be discontinued while emergency board procedures were under way.

The suggestion of the Illinois Central that it had placed its Strike Program in effect more than a month before the Section 6 notice of June 3, 1968, and that the Strike Program had therefore already been incorporated into "working conditions" prior to the notice would seem to the Court an unreasonable manner of conducting labor relations. Employee representatives can hardly be expected to carry Section 6 notices in their back pockets ready to be filled out and handed to the carrier as soon as they learn of a carrier projected activity to which they would object.

■ The Court has in mind the general purposes of the Railway Labor Act as stated in Section 2 (45 U.S.C. § 152), including the avoidance of interruption of commerce and the prompt and orderly settlement of disputes concerning working conditions.

The status quo language contained in Section 5 and in Section 10 of the Act appears to follow the general understanding of status quo—the last actual, peaceable, noncontested condition of the parties (See Words and Phrases, Permanent Edition, Vol. 40, Page 133).

■ The Court therefore interprets the status quo provisions of Section 6 of the Railway Labor Act in its use of the phrase "working conditions" to include "established practices in effect prior to the time the dispute arose", as found in Section 5, and "conditions out of which the dispute arose", as found in Section 10.

■ The Court, in passing on a request for an injunction against a strike, has jurisdiction to determine what were the working conditions, established practices in effect prior to the time the dispute arose, and conditions out of which the dispute arose. The exercise of such jurisdiction does not conflict with the exclusive jurisdiction of the National Railroad Adjustment Board to determine "disputes * * * growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions" (45 U.S.C. § 153 First (i)).

■ The Court concludes that neither the Illinois Central nor the Brotherhood may change "working conditions" until the National Mediation Board has finally acted upon the dispute stated in the Section 6 notice of June 3, 1968, and that "working conditions" includes "established practices in effect prior to the time the dispute arose" and "conditions out of which the dispute arose."

Accompanying this Opinion the Court has entered findings of fact, conclusions of law and final judgment order.

### FINDINGS OF FACT

1. The plaintiff is a common carrier engaged in interstate commerce by railroad and is a "carrier" within the meaning of that term as defined in the Railway Labor Act (45 U.S.C. § 151) and is subject to the provisions of that Act and of the Interstate Commerce Act.

2. The defendant BROTHERHOOD OF LOCOMOTIVE ENGINEERS, an unincorporated association, is a labor organization, national in scope, with headquarters in Cleveland, Ohio, which is the representative, under the Railway Labor Act, of the craft or class of locomotive engineer employees of the plaintiff.

3. The individual defendants are officers of the Brotherhood or employees of the plaintiff in the craft or class of locomotive engineers.

4. The defendant Brotherhood as the representative of the craft or class of locomotive engineers and the plaintiff have entered into a collective bargaining agreement concerning rates of pay, rules, and working conditions, as required by the Railway Labor Act, under which locomotive engineers work for the plaintiff. This collective bargaining agreement does not contain a "scope rule," that is, specific provisions describing exactly what work the craft or class of locomotive engineers is to perform. Historically, many collective bargaining agreements of the operating crafts of railway employees lack such a "scope rule." As early as 1923 the plaintiff recognized in writing the rights of engineers to "man" its engines. In 1944 the plaintiff and the defendant Brotherhood entered into a written agreement, which is still in effect on the plaintiff's railroad, which provided that "the existing duties and responsibilities of engineers will not be assigned to others."

5. The Brotherhood of Locomotive Firemen and Enginemen, a labor organization representing the craft or class of firemen or helpers on the plaintiff railroad, served on the plaintiff a Section 6 notice under the Railway Labor Act, dat-

ed November 15, 1965, proposing the establishment of a program for the training of railroad locomotive enginemen apprentices by the plaintiff and the Brotherhood of Locomotive Firemen and Enginemen. Said Section 6 notice is still pending and undisposed of.

6. The defendant Brotherhood of Locomotive Engineers, as the representative of the craft or class of engineers in the employ of the plaintiff railroad, served on the plaintiff a Section 6 notice under the Railway Labor Act, dated March 20, 1968, seeking the establishment of an apprentice training program for locomotive engineers under the supervision of the plaintiff and of the locomotive engineers in the employ of the plaintiff. The National Mediation Board is using its mediatory efforts to settle the dispute arising from such notice. Negotiations pertaining thereto are at present recessed.

7. Section 6 notices under the Railway Labor Act similar to those described in paragraphs numbered 5 and 6, hereinabove, of these FINDINGS OF FACT have been the subject of litigation in the Federal Courts, as reported in case entitled Brotherhood of Locomotive Engineers v. National Mediation Board, 284 F.Supp. 344 (United States District Court, District of Columbia, April 26, 1968, which is now on appeal).

8. At all times prior to late April or early May, 1968, the plaintiff did not request or require its locomotive engineers to relinquish the controls of the locomotive in their charge to the plaintiff's Traveling Engineers or other management personnel for the purpose of permitting such management personnel to train the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives.

9. In April, 1968, the plaintiff stated to the defendant Brotherhood that the plaintiff was considering inauguration of a Strike Program intended to train its administrative or supervisory personnel so as to maintain partial operation of the railroad in the event of a strike by its trainmen employees represented by the Brotherhood of Railroad Trainmen, but that details of the Strike Program had not been worked out. The defendant Brotherhood replied that if the contemplated Strike Program affected the duties and responsibilities of locomotive engineers in the operation of locomotives in their charge the defendant Brotherhood would object and would take such action as it deemed appropriate.

10. In late April or early May, 1968, the defendant Brotherhood learned that the plaintiff had inaugurated its Strike Program and was requesting and requiring its locomotive engineers to relinquish the controls of the locomotive in their charge to the Traveling Engineers or other management personnel of the plaintiff for the purpose of training the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives. As part of this Strike Program the plaintiff's Traveling Engineers or other management personnel have entered the cabs of its locomotive engines and have directed the locomotive engineer then in charge of the locomotive to turn over the throttle of the locomotive to an accompanying railroad employee such as trainmaster, assistant trainmaster, superintendent's clerk, personnel office clerk, or roundhouse foreman, for the purpose of training such administrative or supervisory personnel to operate the plaintiff's locomotives. Under this Strike Program the locomotive engineer was relieved from responsibility for the locomotive, and the locomotive engineer was told to place himself elsewhere in the locomotive or, in some instances, in a following diesel locomotive unit, but was warned that if the locomotive engineer left the engine and returned to his home he would be discharged. Locomotive engineers who were thus requested or required to relinquish the controls of the locomotive in their charge were paid as though they had performed their duties and responsibilities as locomotive engineers.

11. The defendant Brotherhood protested against this action of the plaintiff in requesting or requiring the locomotive engineers to relinquish the controls of the locomotive in their charge and against the action of the carrier in relieving them of their duties and responsibilities, but the plaintiff denied the protest.

12. After obtaining authorization pursuant to the rules of the Brotherhood of Locomotive Engineers, the defendant Brotherhood served on the plaintiff a Section 6 notice dated June 3, 1968, reading as follows:

"This will serve as formal notice under Section 6 of the Railway Labor Act of the desire of employees represented by the Brotherhood of Locomotive Engineers to revise and supplement existing agreements in accordance with proposal attached hereto, identified as Attachment "A".

"It is the intent of this notice that the proposed agreement will apply to all lines or divisions of railway operated or controlled by the Illinois Central Railroad. Written acknowledgement is requested and pursuant to the provisions of the Railway Labor Act a conference is respectfully requested."

ATTACHMENT "A"

MANNING OF ENGINES

"(1) Locomotive engineers, holding seniority as such in the service of this company, will be used on all locomotives operating on the tracks of this company outside of mechanical facility or engine terminal tracks. Service performed by outside hostlers, in their capacity as such, and service performed by engineers of other railroads, under trackage rights and interchange agreements, will be considered as fulfilling the requirements of this rule.

"(2) Except at the completion of a trip or tour of duty or within the confines of mechanical facility or engine terminal tracks, engineers will not be required or requested to relinquish the controls of the locomotive in their charge to anyone other than the following: (a) locomotive engineers performing service as such, (b) outside hostlers performing service as such, (c) Traveling Engineers for the specific purpose of instructing the engineer charge of the locomotive, and (d) employees training under agreements held by the Brotherhood of Locomotive Engineers for the purpose of establishing seniority as locomotive engineers.

"(3) Engineers will not be subject to discipline or censure in any form for refusing to relinquish the controls of locomotives in their charge except as provided for in paragraph (2) above."

The purpose of this notice was to specify with particularity who would man the plaintiff's engines, and to state positively that engineers would not be subject to discipline for refusing to relinquish the controls of locomotives in their charge. The notice was not intended to, and did not, seek an apprentice locomotive engineer training program under the supervision of the plaintiff and its engineers as proposed in the Section 6 notice of the defendant Brotherhood dated March 20, 1968.

13. Conferences were held June 28, 1968, between the plaintiff and the defendant Brotherhood on the Section 6 notice dated June 3, 1968, as required by the Railway Labor Act, but no agreement was reached and negotiations were terminated, not later than July 5, 1968. A period of more than ten days then elapsed without request for or proffer of the services of the National Mediation Board.

14. During June and July, 1968, the plaintiff continued its above-described Strike Program and required its locomotive engineers to relinquish the controls of locomotives in their charge to the above-described trainees of the plaintiff.

15. The defendant Brotherhood in July, 1968, obtained authority, pursuant to its rules, to call a strike against the plaintiff because of the failure of the plaintiff to agree to revise and supplement the collective bargaining agreement as proposed in the Section 6 notice of June 3, 1968. On July 22, 1968, the Grand Chief Engineer of the defendant Brotherhood notified the National Mediation Board, Washington, D. C., by telephone and by telegram, that the engineers in the service of the plaintiff had scheduled a peaceful withdrawal from service for 12:01 A.M. July 23, 1968. Such scheduled withdrawal from service had no connection with the Section 6 notice of the defendant Brotherhood dated March 20, 1968, referred to in paragraph 6 hereinabove of these FINDINGS OF FACT which proposed an apprentice locomotive engineer training program under the supervision of the plaintiff and its engineers.

16. The National Mediation Board found that a labor emergency existed and on July 22, 1968, proffered its services pursuant to Section 5 of the Railway Labor Act, requested the parties to maintain the status quo while the dispute was investigated, docketed the case as N M B Case E–342, and requested the defendant Brotherhood to defer strike action pending the Board's efforts to resolve the dispute. The Board assigned Mediator Quinn, who was already on the plaintiff's property, to handle the case. Under the rates of pay, rules, or working conditions or established practices in effect between the plaintiff and its locomotive engineers prior to the time the dispute arose the plaintiff had not requested or required its locomotive engineers to relinquish the controls of the locomotive in their charge to the plaintiff's Traveling Engineers or other management personnel for the purpose of permitting such management personnel to train the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives.

17. The plaintiff and the defendants accepted the offer of the National Mediation Board to attempt to resolve the dispute. The plaintiff on July 22, 1968, reached this agreement with defendant Brotherhood:

"This will confirm our telephone conversation this afternoon regarding BLE notice June 3, 1968, on the manning of engines. As I told you, we will suspend the training of personnel in this connection for the next two days July 23 and 24. You assured me the BLE will postpone the strike authorized for tonight."

18. The parties met with Mediator Quinn on July 24, 1968, concerning the Section 6 notice of June 3, 1968, but no settlement was effected. The Case arising out of said unresolved Section 6 notice of June 3, 1968, remains on the docket of the National Mediation Board. The defendant Brotherhood has asked the Board to make further settlement efforts. The Board has noted the present litigation between the parties, and has requested the parties to keep it advsied as to further action.

19. Representatives of the plaintiff and representatives of the defendant Brotherhood met on February 4, 1969, to attempt again to reach an agreement which would resolve the request of the defendant Brotherhood contained in the said Section 6 notice of June 3, 1968. The plaintiff's representatives argued that the said Section 6 notice dated June 3, 1968, brought the plaintiff into a jurisdictional dispute between the defendant Brotherhood and the other engine service organization, and particularly referred to sub-section (d) of Item 2 of the Section 6 notice which reads as follows:

"(d) employees training under agreements held by the Brotherhood of Locomotive Engineers for the purpose of establishing seniority as locomotive engineers."

The representatives of the defendant Brotherhood stated that they did not agree that the said Section 6 notice brought the plaintiff into such a jurisdictional dispute but on February 7,

1969, wrote the plaintiff, in part, as follows:

"* * * in order this fear be removed from the Carrier's shoulders we are, by this letter, withdrawing from further handling that portion of our Section 6 Notice above quoted, and the National Mediation Board will be so advised in order their records be changed to indicate this portion of the dispute in their docket E–342 is no longer a subject for handling by the Board."

It was not the intent or purpose of the defendant Brotherhood by its said Section 6 notice of June 3, 1968, to bring the plaintiff into a jurisdictional dispute between the defendant Brotherhood and any other engine service organization. The defendant Brotherhood intended by its said Section 6 notice dated June 3, 1968, to bargain solely for the craft or class of engineers in the employ of the plaintiff, which it represents, in the manning of the engines, and to bargain as to their duties and responsibilities while so manning said engines.

20. On December 10, 1968, the plaintiff wrote to the National Railroad Adjustment Board, First Division, in part, as follows:

"The following dispute between the Illinois Central Railroad Company and the Brotherhood of Locomotive Engineers is hereby submitted ex parte for determination:

"Claim of the Illinois Central Railroad that it has the right to train its officers and employees in the operation of locomotives on locomotives manned by engineers, i. e., that nothing in the rules established by the railroad's collective bargaining agreements with the Brotherhood of Locomotive Engineers or established in any other manner restricts the railroad's right to require its locomotive engineers to relinquish the controls of locomotives in their charge (a) to firemen or other employees being trained to operate locomotives or (b) to travelling engineers or other management personnel for the purpose of training administrative, supervisory, or other personnel to operate locomotives."

21. The defendants allege that this litigation arises out of the unresolved Section 6 notice of June 3, 1968, served by the defendant Brotherhood on the plaintiff, and that this litigation involves a labor dispute which is a "major dispute", as that term is used in litigation under the Railway Labor Act. The plaintiff admits that this litigation involves a "major dispute", but avers that the litigation also involves a "minor dispute" as to the meaning and application of the parties' agreements (45 U.S.C. § 153 First (i)), and "may also involve a representation dispute subject to Section 2 Ninth of the Railway Labor Act (45 U.S.C. § 152 Ninth)."

22. This case involves a "major dispute" as that term is used in litigation under the Railway Labor Act in that it arises out of the defendant Brotherhood's unresolved Section 6 notice of June 3, 1968.

23. This litigation does not involve a "minor dispute" as to the meaning and application of the parties' agreements, and the submission made by the plaintiff on December 10, 1968, to the National Railroad Adjustment Board, First Division, has no application to the labor dispute arising from the defendant Brotherhood's Section 6 notice of June 3, 1968, and from the failure of the parties to resolve such labor dispute.

24. This litigation does not involve a representation dispute subject to Section 2 Ninth of the Railway Labor Act, and the Section 6 notice of June 3, 1968, does not raise a dispute between the defendant Brotherhood as the representative on the plaintiff's railroad of the craft or class of locomotive engineers and the representative on the plaintiff railroad of any other craft or class as to their respective jurisdiction.

25. The defendant Brotherhood has stated to the Court that it will postpone its scheduled strike until the National Mediation Board notifies both parties

in writing that its mediatory efforts have failed, and for such further period or periods as may be required under the Railway Labor Act, provided the plaintiff does not request or require its locomotive engineers to relinquish the controls of the locomotives in their charge to the plaintiff's administrative and supervisory personnel for the purpose of training them to operate the plaintiff's locomotives, as hereinabove described.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties under the Constitution and laws of the United States, including the Judicial Code (28 U.S.C. §§ 1331 and 1337) and the Railway Labor Act (45 U.S.C. § 151 et seq). The amount involved in this controversy exceeds the sum of $10,000.00, exclusive of interest and costs.

2. The defendants have a joint and common interest with and can and do fairly and adequately represent the members of the defendant Brotherhood of Locomotive Engineers and the craft or class of locomotive engineers in the employ of the plaintiff. This is a proper class suit.

3. The defendants' Section 6 notice of June 3, 1968, is a proper subject of collective bargaining under the Railway Labor Act.

4. The plaintiff and the defendants are bound by the status quo provisions of Section 5 of the Railway Labor Act (45 U.S.C. § 155), and until such time as the National Mediation Board has notified both parties in writing that its mediatory efforts in N M B Case E–342, or in such re-designation of such Case as may be made by the National Mediation Board, have failed, and until the other and further applicable periods of time provided in the Railway Labor Act have expired, no change may be made by either party in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose.

5. The plaintiff's action of requesting or requiring its locomotive engineers to relinquish the controls of the locomotives in their charge to the Traveling Engineers or other management personnel of the plaintiff for the purpose of training the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives constituted a change in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose, in violation of Section 5 of the Railway Labor Act (45 U.S.C. § 155).

6. The status quo provisions of Section 5 of the Railway Labor Act in this "major dispute" limit and take precedence over whatever may be the "management prerogative" claimed by the plaintiff, namely, the claim of the plaintiff that it has the right to inaugurate a Strike Program under which the plaintiff will train its administrative or supervisory personnel on locomotives manned by duly assigned engineers by requiring such engineers to relinquish control of their locomotives to the plaintiff's administrative or supervisory personnel for the operation of the plaintiff's locomotives.

7. The provisions of Section 8 of the Norris-LaGuardia Act (29 U.S.C. § 108) are applicable to the plaintiff, and the Court is prohibited from granting the plaintiff injunctive relief because the plaintiff has failed to comply with obligations imposed by the Railway Labor Act which are involved in the labor dispute in question.

8. In the event this dispute should be held to arise from a "minor dispute" to an extent sufficient to entitle the plaintiff to any injunctive relief, then such relief should be conditioned on the maintenance by the parties of the status quo until such time as the National Railroad Adjustment Board or a special board of adjustment has rendered its award on such "minor dispute," that is, the plaintiff may not request or require its locomotive engineers to relinquish the

controls of the locomotives in their charge to the Traveling Engineers of the plaintiff, or to other management personnel of the plaintiff, for the purpose of training the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives, and the craft or class of engineers in the employ of the plaintiff may not strike or otherwise withdraw from the service of the plaintiff on account of such dispute.

### FINAL JUDGMENT ORDER

1. Until such time as the National Mediation Board has notified the plaintiff, Illinois Central Railroad Company, and the defendant Brotherhood of Locomotive Engineers in writing that its mediatory efforts in N M B Case E–342, or in such re-designation of such Case as may be made by the National Mediation Board, have failed, and until the other and further applicable periods of time provided in the Railway Labor Act have expired, the plaintiff, Illinois Central Railroad Company, is enjoined from requesting or requiring its locomotive engineers to relinquish the controls of the locomotives in their charge to the Traveling Engineers of the plaintiff, Illinois Central Railroad Company, or to other management personnel of said plaintiff, for the purpose of training the plaintiff's administrative or supervisory personnel to operate the plaintiff's locomotives.

2. Until such time as the National Mediation Board has notified the plaintiff, Illinois Central Railroad Company, and the defendant Brotherhood of Locomotive Engineers in writing that its mediatory efforts in N M B Case E–342, or in such re-designation of such Case as may be made by the National Mediation Board, have failed, and until the other and further applicable periods of time provided in the Railway Labor Act have expired, the defendant Brotherhood of Locomotive Engineers and the other defendants herein, and the craft or class of locomotive engineers in the employ of the plaintiff, are enjoined from striking or otherwise withdrawing from the service of the plaintiff because of the failure of the plaintiff to agree to revise and supplement the collective bargaining agreement between the parties as proposed in the defendant Brotherhood's Section 6 notice of June 3, 1968, as amended.

3. This cause is dismissed without costs to either plaintiff or the defendants.